

**FILED**

**AUG 2 7** 2019

U.S. DISTRICT COURT-WVN
MARTINSBURG, WV 2540

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

IN THE MATTER OF THE APPLICATION
OF THE UNITED STATES OF AMERICA
FOR AN ORDER AUTHORIZING THE
INITIAL INTERCEPTION OF WIRE
AND ELECTRONIC COMMUNICATIONS
TO AND FROM SPRINT CORP.
CELLULAR NUMBER (304) 579-0270 (TT2)

3:19MC 33

UNDER SEAL

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Jeffrey Cisar, Special Agent of the Federal Bureau of Investigation, being duly sworn, depose and state that:

1.  I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.  I have been a Special Agent with the Federal Bureau of Investigation (FBI) since September 2004. I have received basic drug, gang, and criminal enterprise investigative training at the FBI Training Academy located in Quantico, Virginia. I am currently assigned to the FBI Pittsburgh Division, specifically to the Eastern Panhandle Drug and Violent Crimes Task Force (EPD&VCTF) in Martinsburg, West Virginia. Prior to my current assignment, I was assigned to the FBI Counterterrorism Unit and to the FBI Baltimore Division where I investigated drug and violent crime matters.

3.  I have been serving in the capacity of EPD&VCTF coordinator for approximately six years. My current assignment requires extensive knowledge of matters related to illegal drug trafficking and violent gang activity in the

1

Eastern Panhandle of West Virginia. As part of my duties as a Special Agent, I investigate criminal activity related to drug trafficking, in violation of 21 U.S.C. § 841(a)(1).   My experience includes, but is not limited to, conducting surveillance, interviewing witnesses, conducting database checks, analyzing telephone records, writing affidavits for search warrants, executing search warrants, and working with undercover agents and informants.  I am familiar with matters including, but not limited to, the means and methods used by drug trafficking organizations to purchase, transport, store, and distribute drugs, and the concealing of profits generated from those transactions.  Through my training and experience, I have become familiar with the methods of operations typically utilized by individuals who distribute drugs.  I know that it is common practice for drug traffickers to routinely utilize telephones, mobile phones, prepaid phones, calling cards, public telephones, text messaging, counter-surveillance, false or fictitious identities, and coded communications to communicate with their customers, suppliers, couriers, and other conspirators for the purpose of insulating themselves from the detection of law enforcement. Moreover, it is not unusual for them to initiate such mobile or prepaid phone service in the name of an associate or family member or in the name of a fictitious individual.  The individuals often require the use of a telephone facility to negotiate times, places, schemes, and manners for importing, possessing, concealing, and distributing controlled substances, and for arranging the concealment of proceeds derived from the sale of controlled substances.   Furthermore, I have extensive experience in Title III investigations having served as a case agent and Title III affiant in multiple EPD&VCTF cases.

PURPOSE OF AFFIDAVIT

4.     This Affidavit is being submitted in support of an application for an order
authorizing the interception of wire communications, including any voicemail
messages intercepted as they are contemporaneously left or retrieved, and the
interception of electronic communications including, but not limited to, text
messages of SHAQUAN RICHARDSON, THEODORE RICHARDSON,
BRAHEEM GILBERT, ALVIN GILBERT, VALERIA VINCENT, ASHLEY
HESS, CHRISTOPHER MOSBY, JUSTIN JENKINS, ARMSTEAD CRAIG,
BONI FACIO ARAMBURO, and other persons as yet unknown ("TARGET
INTERCEPTEES") occurring to and from the following cellular telephone:

a.     Cellular telephone bearing the number (304) 579-0270, and
accessed through International Mobile Subscriber Identity (IMSI)
number 310120058809710 ("TARGET TELEPHONE 2" or (TT2)),
no subscriber name and subscriber address of 176 Lee St.,
Martinsburg, WV 25404, serviced by Sprint Corp. and used by
SHAQUAN RICHARDSON.

5.     TT2 is being utilized by RICHARDSON for offenses involving violations of 18
U.S.C. § 2516; namely violations of 21 U.S.C. § 841, 21 U.S.C. § 843(b), 21 U.S.C.
§ 846, and 18 U.S.C. § 1952. "TARGET OFFENSES".

6.     The authorization given applies to the target telephone number listed above,
but also to any other telephone number or telephone accessed through the
above-referenced IMSI number, and to any other IMSI number accessed
through that target telephone number referenced above, within the thirty-day
period.  The authorization is also intended to apply to the target telephone
number referenced above regardless of service provider(s), and to background

3

conversations intercepted in the vicinity of the target telephone while the telephone are off the hook or otherwise in use.

7.    As a result of my personal participation in this investigation and reports made to me by other law enforcement officers and information obtained from confidential sources, I am familiar with all aspects of this investigation. On the basis of this familiarity, and on the basis of other information that I have reviewed and determined to be reliable, I declare that the facts contained in this Affidavit show that there is probable cause to believe that SHAQUAN RICHARDSON, THEODORE RICHARDSON, BRAHEEM GILBERT, ALVIN GILBERT, VALERIA VINCENT, ASHLEY HESS, CHRISTOPHER MOSBY, JUSTIN JENKINS, ARMSTEAD CRAIG, BONI FACIO ARAMBURO ("TARGET SUBJECTS"), and others as yet unknown, have committed, are committing, and will continue to commit violations of:

    a.    21 U.S.C. § 841 – Possession with the intent to distribute and distribution of a controlled substance, namely heroin and cocaine base;

    b.    21 U.S.C. § 843(b) – Use of a communication facility to further the commission of a felony-controlled substance offense;

    c.    21 U.S.C. § 846 – Conspiracy to possess with the intent to distribute and to distribute controlled substances; and

    d.    18 U.S.C. § 1952 – Interstate travel in aid of unlawful activity. (collectively the "TARGET OFFENSES.")

8.    Additionally, based upon the investigation in this case, there is probable cause to believe the following:

    a.    SHAQUAN RICHARDSON is using TT2 in connection with the commission of the TARGET OFFENSES;

4

      b.      particular wire and electronic communications of the TARGET INTERCEPTEES and others as yet unknown, concerning the TARGET OFFENSES will be obtained through the interception of wire and electronic communications occurring to and from **TT2**; and,

      c.      the communications will likely identify and provide admissible evidence concerning:

           i.     the TARGET OFFENSES;

           ii.     the names, telephone numbers, and residences of associates of the Target Subjects, and others as yet unknown, including their drug supplier;

           iii.    the leadership of the drug trafficking organization;

           iv.    the dates, times, and places for commission of the illegal activities including drug distribution, and other related gang activity;

           v.     the location, receipt, administration, control, management, and disposition of United States currency, illegal narcotics, and assets to include business, vehicles, and items purchases with funds gained through the distribution of narcotics;

           vi.    the nature, scope, places, and methods of operation; and,

           vii.   the existence and location of records documenting the distribution of narcotics and gang related activities.

9.     Normal investigative procedures have been tried and have failed, appear unlikely to succeed if tried, or are too dangerous to employ, as described herein in further detail.

5

## BASIS OF INFORMATION

10.   I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

    a.   my experience investigating narcotics trafficking and gangs and criminal organizations;

    b.   oral and written reports, and documents about this investigation that I have received from members of the Federal Bureau of Investigation, local law enforcement, and other federal law enforcement agencies;

    c.   discussions I have had personally concerning this investigation with experienced criminal enterprise investigators;

    d.   physical surveillance conducted by the Federal Bureau of Investigation and local law enforcement agencies, the results of which have been reported to me either directly or indirectly;

    e.   public records;

    f.   telephone toll records, pen register and trap and trace information, and telephone subscriber information;

    g.   precise location data received from search warrants;

    h.   statements of confidential sources;

    i.   consensually-recorded meetings and phone calls over **TT2**; and

    j.   controlled purchases of heroin and crack cocaine from subject SHAQUAN RICHARDSON.

11.   In addition to the foregoing, I specifically relied on oral reports/opinions from other law enforcement officers.

12.   Since this Affidavit is being submitted for the limited purpose of securing authorization for the interception of wire and electronic communications, I have

6

not included each and every fact known to me concerning this investigation or every aspect of the investigation to date.  I have set forth only the facts that I believe are necessary to establish the foundation for probable cause for an order authorizing the interception of wire and electronic communications.

## TARGET SUBJECTS/TARGET INTERCEPTEES

13.    Information about the TARGET SUBJECTS/TARGET INTERCEPTEES comes from the following sources and criminal indices:  Confidential informant (CI) debriefings, law enforcement controlled narcotics purchases, physical surveillance conducted by law enforcement officers, information queries conducted through law enforcement databases and through commercial and public databases, and through telephone records obtained via administrative subpoena.  Through a review of that information, the following persons have been identified:

a. SHAQUAN RICHARDSON, also known as "Wave" (herein referred to as RICHARDSON) has been identified by law enforcement officers to be utilizing telephone numbers 571-465-6400 (referred to in this affidavit as **TT1**) and 304-579-0270 (**TT2**).  RICHARDSON is known to be residing in Jefferson County, West Virginia.  RICHARDSON has a date of birth of Redacted 1996, social security number of XXX-XX-9917, and FBI#: 190991CE0.  RICHARDSON's criminal history reflects multiple arrests for drug possession and distribution.  He was convicted of misdemeanor drug possession in April 2016.  In December 2017, RICHARDSON was arrested in Martinsburg, WV on charges of 1st Degree Robbery, Malicious Assault/Wounding, and Abducting a person with intent to defile.  The captioned charges stemmed from an incident in which RICHARDSON allegedly held an individual against his/her will and then shot the individual.  RICHARDSON pled guilty to making threats to kidnap or

7

demand ransom and wanton endangerment with a firearm. The EPD&VCTF conducted multiple controlled purchases of heroin and crack cocaine from RICHARDSON over **TT1** and **TT2** which are further detailed later in this affidavit. Investigators are aware from telephonic contact with Verizon Corporate Security officials that RICHARDSON's use of **TT1** ended at the beginning of August 2019. Verizon specifically advised that service was discontinued on or around July 27, 2019 by RICHARDSON.

b. BRAHEEM GILBERT (herein referred to as BRAHEEM) has been identified by law enforcement officers to be utilizing telephone number 304-261-1662 (herein referred to as "Conspirator Phone 2" or (CP2). BRAHEEM was known to be residing in Berkeley County, West Virginia. BRAHEEM has been confirmed to be the user of CP2 by way of multiple EPD&VCTF controlled drug buys, further detailed in this affidavit, facilitated over CP2 with BRAHEEM. BRAHEEM has a date of birth of Redacted/1989, social security number of XXX-XX-3444, and FBI#: 992126WC7. BRAHEEM's criminal history reflects multiple felony convictions related to unlawful possession of a handgun, CDS possession, and Aggravated Assault. His most recent felony conviction for CDS possession occurred in February 2014. His most recent felony conviction for aggravated assault with a weapon occurred in July 2014. The captioned conviction for aggravated assault resulted in a four-year sentence of incarceration in state prison. BRAHEEM was released from prison in January 2017. The EPD&VCTF conducted a controlled purchase of heroin and crack cocaine from BRAHEEM on 06/20/2019 and again on 07/28/2019, which is detailed later in this affidavit.

c. ALVIN GILBERT (herein referred to as ALVIN) is currently incarcerated at the Eastern Regional Jail in Martinsburg, WV. Prior to his arrest, ALVIN was known to be utilizing 681-247-9111 (herein

8

referred to as "Conspirator Phone 6" or (CP6)). CP6 was confirmed to belong to ALVIN at the time of his arrest on February 7, 2019 as further detailed later in this affidavit. ALVIN was arrested by the EPD&VCTF for a drug related homicide which occurred on February 3, 2019 in Martinsburg, WV. Prior to his arrest, on January 31, 2019, the EPD&VCTF conducted two controlled purchases of Fentanyl and crack cocaine. ALVIN has a date of birth of ▮Redacted▮ 1992, social security number of XXX-XX-7985, and FBI#: 718669LC9. ALVIN's criminal history reflects multiple felony arrests (dispositions unknown) related to possession with intent to distribute narcotics. Additionally, ALVIN has multiple arrests for unlawful possession of a handgun. ALVIN was arrested in February 2019 for first degree murder, a charge associated with a drug-related homicide which occurred on or around the time that the EPD&VCTF was conducting controlled purchases of narcotics from ALVIN. The captioned controlled drug buys are further detailed later in this affidavit.

d. THEODORE RICHARDSON (herein referred to as THEODORE) has been identified by law enforcement officers to be utilizing telephone number 304-482-8131 (herein referred to as "Conspirator Phone 7" or (CP7)). CP7 has been confirmed to be in the possession of THEODORE. Officers confirmed this through a controlled heroin buy conducted by the EPD&VCTF from THEODORE which was facilitated over CP7 and observed to be utilized by THEODORE. THEODORE is known to be residing in Berkeley County, West Virginia. THEODORE has a date of birth of ▮Redacted▮ 1964, social security number of XXX-XX-0317, and FBI#: 496985DA2. THEODORE's criminal history reflects multiple felony convictions in West Virginia and New Jersey related to burglary, drug distribution, drug possession, and unlawful possession of weapons. His most recent felony drug conviction related to heroin possession and

9

distribution in New Jersey occurred in May 2000.  His most recent West Virginia felony drug conviction for cocaine distribution occurred in 2014. The EPD&VCTF conducted a controlled purchase of heroin and crack cocaine from THEODORE on 06/20/2019 and again on 07/28/2019, which is further detailed later in this affidavit.

e. VALERIA VINCENT (herein referred to as VINCENT) has been identified by law enforcement officers as a target subject of this investigation and is the girlfriend of ALVIN.  VINCENT is known to be residing in Berkeley County, West Virginia. VINCENT has a date of birth of ▓▓▓ 1987 a social security number of XXX-XX-4244, and FBI# 922933JC9.  VINCENT has multiple felony drug distribution arrests in West Virginia, New York, and Maryland.  Additionally, VINCENT has a federal conviction in the Northern District of West Virginia for drug distribution in 2011 and was sentenced to approximately five years of federal incarceration. The EPD&VCTF made a controlled purchase of $100 worth of heroin from VINCENT on February 8, 2019 and arrested her immediately following the controlled drug buy.   VINCENT was interviewed subsequent to the arrest. VINCENT did not reveal her source of drug supply nor identify the hierarchy of the drug trafficking organization she was a part of. VINCENT's interview yielded information which supported ALVIN's involvement in a drug-related homicide that occurred on February 3, 2019 and is detailed later in this affidavit.

f. CHRISTOPHER MOSBY (herein referred to as MOSBY) has been identified by law enforcement officers to be utilizing telephone number 304-995-1968 (herein referred to as "Conspirator Phone 1" or (CP1)). MOSBY and ASHLEY HESS are in a relationship and are known to be living together in a trailer located in Berkeley County, WV.  MOSBY has a date of birth of ▓▓▓ 1969, social security number of XXX-XX-7745, and

10

FBI#: 416363NB1.  MOSBY's criminal history reflects arrests related to drug possession in the Northern District of West Virginia.  In February 2014, the EPD&VCTF executed a search on a motel room in Berkeley County, WV after obtaining information related to a heroin overdose that was associated to a dealer using the hotel room.  Upon execution of the search warrant, MOSBY was determined to be an occupant of the room.  Officers located a loaded handgun, marijuana, several empty baggies of heroin, and heroin use paraphernalia.  Mosby was charged by the EPD&VCTF with drug possession.  While continuing to develop the investigation, approximately two weeks after the aforementioned search warrant, MOSBY was arrested by the WVSP and later convicted for kidnapping and domestic battery.  An administrative subpoena issued to Sprint Corp. revealed CP1 to be subscribed to by CHRIS MOSBY residing at his associated address in Berkeley County, WV.

g. ASHLEY HESS (herein referred to as HESS) has been identified by law enforcement officers to be utilizing telephone number 304-820-6254 (herein referred to as "Conspirator Phone 12" or (CP12)) and 304-820-6452 (herein referred to as "Conspirator Phone 13" or (CP13)).  HESS has also been known by investigators to utilize MOSBY's phone (CP1) due to the fact that HESS and MOSBY are in a relationship and live in the same residence.  HESS is known to live with MOSBY in a trailer located in Berkeley County, West Virginia.  HESS has a date of birth of ███████ 1989, social security number of XXX-XX-2092, and FBI#: 368829WD4.  HESS's criminal history reflects arrests related to heroin possession in the District of Maryland and fraud and larceny in the Northern District of West Virginia.  On 06/12/19, the EPD&VCTF placed a controlled "spoof" telephone call to CP1.  The call was answered by a female voice, positively identified as HESS.  This positive identification was made by EPD&VCTF investigators spoke to HESS on multiple occasions and are familiar with

11

her voice both in person and on the telephone.   An administrative subpoena issued to Sprint Corp. revealed CP12 to be subscribed to by ASHLEY HESS residing at her associated address in Berkeley County, WV.  Utility records for HESS list CP13 as HESS's contact telephone number.  On 08/12/2019, the EPD&VCTF utilized CI-43 to successfully conduct a controlled purchase of cocaine and heroin, from HESS which is further detailed later in this affidavit.

h.   ARMSTEAD CRAIG (herein referred to as CRAIG) is currently incarcerated at the Eastern Regional Jail in Martinsburg, WV. CRAIG was arrested in January 2019 after being federally indicted in the Northern District of West Virginia for conspiracy and heroin distribution.  CRAIG was a target subject of a previous EPD&VCTF investigation in which investigators sought and obtained authority in the Northern District of West Virginia (3:18MJ103) to intercept voice and electronic communications occurring over CRAIG's identified cell phone.   Additional arrests and convictions present in CRAIG's criminal history include but are not limited to a 1999 conviction for brandishing and carrying a firearm without a license, and a federal conviction in 2001 for crack cocaine distribution resulting in a 188-month federal prison sentence.  CRAIG was released on probation in 2011 and violated the terms of his probation in May 2011.  He served an additional four months of incarceration until he was arrested by the EPD&VCTF in January 2019 as noted earlier.  CRAIG has a date of birth of ▓Redacted▓/1979, social security number of XXX-XX-9723, and FBI#: 493841MB9.

i.   BONI FACIO ARAMBURO (herein referred to as ARAMBURO) has been identified by the EPD&VCTF as a drug supplier/distributor to multiple individuals in the Eastern Panhandle of West Virginia.

Case 3:19-mc-00033-GMG *SEALED*   Document 1-2   Filed 08/27/19   Page 13 of 66  PageID #: 33

ARAMBURO has a criminal history reflecting arrests for possession with intent to distribute narcotics, illegal possession of a firearm, and felony manslaughter. During an EPD&VCTF investigation conducted in the Summer of 2018 through Spring of 2019, authority to intercept wire and electronic communications occurring over cellular telephones being used by CRAIG in the Northern District of West Virginia (3:18MJ103) was sought and obtained. Intercepted communications between CRAIG and ARAMBURO and between CRAIG and JENKINS revealed that ARAMBURO utilized JENKINS as his driver and drug "tester" as evidenced in intercepted telephone calls on 11/15/18 and 12/11/18. Additionally, on 04/08/19, the EPD&VCTF conducted a controlled purchase of heroin from ARAMBURO, and JENKINS drove ARAMBURO to the drug transaction. ARAMBURO has a date of birth of ███ 1984, social security number of XXX-XX-0393, and FBI#: 59952JC3.

j.    JUSTIN JENKINS (herein referred to as JENKINS) has been identified by law enforcement officers to be utilizing telephone number 304-240-7309 (herein referred to as "Conspirator Phone 4" or (CP4)). While monitoring CRAIG's intercepted wire and electronic communications in 3:18-MJ-103, officers intercepted communications between CRAIG and JENKINS wherein JENKINS used CP4. Specifically, the EPD&VCTF intercepted a call on 01/03/19 between CRAIG (240-586-3412) and JENKINS (CP4). During the call, JENKINS advised that ARAMBURO had an outstanding warrant and JENKINS was willing to help ARAMBURO by providing a place that he could stay and not be located by authorities. JENKINS

13

further advised that he would be able to provide ARAMBURO with another telephone.  JENKINS is known to be residing in Jefferson County, West Virginia. JENKINS has a date of birth of    1987 and a social security number of XXX-XX-8800.  JENKINS does not have a criminal history.   During an EPD&VCTF investigation conducted in the Summer of 2018 through the Spring of 2019, authority to intercept voice and electronic communications occurring over cellular telephones being used by CRAIG in the Northern District of West Virginia (3:18MJ103) was sought and obtained. Intercepted conversations between CRAIG and ARAMBURO and between CRAIG and JENKINS revealed that ARAMBURO utilized JENKINS as his driver and drug "tester" as evidenced in intercepted telephone calls on 11/15/18 and 12/11/18. Specifically, an intercepted call between CRAIG and ARAMBURO on 11/15/2018 revealed CRAIG warning ARAMBURO by stating, "You can't go shopping with anybody man I don't give a fuck...where ever you at.  You'll get some shit then that then these niggers don't answer they phone anymore so you gonna be stuck with it. Then you gonna be pissed."   CRAIG was warning ARAMBURO about purchasing heroin from a new supplier with out first having the quality tested.   ARAMBURO responded "That's why I said I ain't got no choice but to take Justin with me. Try this shit out, shit. Try this shit out you know I mean? No good we out. Fuck it. I had that nigger out, I had I had him I had

14

him thirsty the whole the whole time we was up there." ARAMBURO is referring to JENKINS as "Justin" and advising that he had JENKINS test the heroin prior to obtaining the new supply. An intercepted call between CRAIG and ARAMBURO on 12/25/2018 revealed ARAMBURO advising to CRAIG that he had recently resupplied with heroin and was waiting to tell CRAIG about the quality until he had JENKINS test the product. Specifically, ARAMBURO stated, "I said I went up there last night. I ain't want to say nothing until I got the uh..to to Justin? down here and shit yo. Yeah shit some gasoline." ARAMBURO is advising that the quality is good, "gasoline." CRAIG responds by asking ARAMBURO, "Oh how much you paid?" ARAMBURO responds, "Man that bitch ass nigga yo he try go, he tried to go up to mother fucking damn near 7 I said I'm good yo. I saw that, what what the fuck he say man cranky ass what the fuck I told you he said that day." The captioned 12/25/18 intercepted conversation further reveals JENKINS role as the "tester" for CRAIG and ARAMBURO's heroin trafficking organization. Additionally, on 04/08/19, the EPD&VCTF conducted a controlled purchase of heroin from ARAMBURO, and JENKINS drove ARAMBURO to the drug transaction.

## PRIOR APPLICATIONS

15

Case 3:19-mc-00033-GMG *SEALED*   Document 1-2   Filed 08/27/19   Page 16 of 66   PageID #: 36

14. On August 20, 2019, the electronic surveillance indices of the Federal Bureau of Investigation, the Drug Enforcement Administration, and the Department of Homeland Security/Homeland Security Investigations were checked. There have been no prior applications seeking court authorization to intercept the wire, oral, or electronic communications of the TARGET SUBJECTS/TARGET INTERCEPTEES or involving the TARGET TELEPHONE, other than the following: On 11/06/2018, the United States District Court for the Northern District of West Virginia issued an order (3:18-MJ-103) authorizing the interception of wire and electronic communications to and from a cellular telephone bearing the number 240-586-3412, used by ARMSTEAD CRAIG. Interceptions terminated on 12/05/2018. CRAIG, ARAMBURO, and JENKINS, TARGET SUBJECTS in the instant investigation, were intercepted over the phone.

## SOURCES OF INFORMATION

15. Special Agents of the Federal Bureau of Investigation and local officers have received information concerning the illegal drug trafficking activities of members of the drug trafficking organization ("DTO").

16. CI-19:   Confidential Informant "19" (CI-19) began cooperating with the EPD&VCTF in January 2019 and providing information regarding the instant investigation. CI-19 was motivated to cooperate and provide assistance to law enforcement authorities for consideration in a pending criminal matter. CI-19 provided the EPD&VCTF with information regarding target subjects of a drug trafficking organization (DTO), specifically target subjects ALVIN and VINCENT.   The information provided by CI-19 was corroborated through consensually monitored communications made with target subjects ALVIN and VINCENT through controlled purchases of narcotics made from ALVIN and VINCENT. CI-19 has a juvenile delinquency record reflecting criminal acts

16

that do not include deception-related offenses.   CI-19 has an adult criminal history reflecting criminal acts including drug paraphernalia and drug possession.  CI-19's adult criminal history does not include deception-related offenses.  Information provided to the EPD&VCTF by CI-19 was determined to be gleaned from first-hand interaction with target subjects of this investigation. Within the context of the information provided by CI-19, which was detailed and relied upon for purposes of this application, law enforcement believes the confidential source is credible and his/her information is reliable.

17.   CI-FORTY:  Confidential Informant "FORTY" (CI-FORTY) began cooperating with the EPD&VCTF in April 2019 and providing information regarding the instant investigation.   CI-FORTY was motivated to cooperate and provide assistance to law enforcement authorities for consideration in a pending criminal matter.  CI-FORTY provided the EPD&VCTF with information the drug trafficking organization (DTO) in this instant investigation. CI-FORTY provided information regarding target subject SHAQUAN RICHARDSON (RICHARDSON) and yet to be fully identified target subjects in West Virginia and New Jersey that were associated with this DTO. The information provided by  CI-FORTY  was  corroborated  through  consensually  monitored communications made with RICHARDSON and through controlled purchases of narcotics made from RICHARDSON.  CI-FORTY's adult criminal history relates to drug possession and distribution. CI-FORTY's adult criminal history does not include deception-related offenses.  Information provided to the EPD&VCTF by CI-FORTY was determined to be gleaned from first-hand interaction with target subjects of this investigation and through conversations with individuals familiar with target subjects of this investigation. Within the context of the information provide by CI-FORTY which was detailed and relied upon for purposes of this application, law enforcement believes the confidential source is credible and his/her information is reliable.

17

18.   CI-BLUE:  Confidential Informant "BLUE" (CI-BLUE) began cooperating with the EPD&VCTF in June 2019 and providing information regarding the instant investigation.  CI-BLUE was motivated to cooperate and provide assistance to law enforcement authorities for consideration in a pending criminal matter.  CI-BLUE provided the EPD&VCTF with information about the drug trafficking organization (DTO) in this instant investigation.   CI-BLUE provided information regarding BRAHEEM, THEODORE, and yet to be fully identified target subjects in West Virginia and New Jersey that were associated with this DTO.   The information provided by CI-BLUE was corroborated through consensually monitored communications made with target subjects in this investigation and through controlled purchases of narcotics made from target subjects in this investigation.  CI-BLUE's adult criminal history relates to drug possession and distribution.  CI-BLUE's adult criminal history does not include deception-related offenses.   Information provided to the EPD&VCTF by CI-BLUE was determined to be gleaned from first-hand interaction with target subjects of this investigation and through conversations with individuals familiar with target subjects of this investigation.   Within the context of the information provide by CI-BLUE, which was detailed and relied upon for purposes of this application, law enforcement believes the confidential source is credible and his/her information is reliable.

19.   CI-43:   Confidential Informant "43" (CI-43) began cooperating with the EPD&VCTF in 1999 and providing information regarding the instant investigation.   CI-43 was originally motivated to cooperate and provide assistance to law enforcement authorities for consideration in a criminal matter.  CI-43 has continued to maintain contact and provide information with to the EPD&VCTF in furtherance of assisting in drug investigations.  Since 1999, CI-43 has conducted in excess of twenty (20) successful controlled purchases of narcotics for the EPD&VCTF.  Assistance provided by CI-43 has resulted in convictions in federal and state court cases.   CI-43 provided

18

information regarding HESS, MOSBY, and other yet to be fully identified target subjects in West Virginia associated with this DTO. The information provided by CI-43, regarding HESS, was corroborated through consensually monitored communications made with HESS in this investigation and through a controlled purchase of narcotics made from HESS. CI-43 further advised that HESS was living with MOSBY in a trailer located in Berkeley County, WV and that MOSBY was also assisting HESS in distributing narcotics. CI-43 has an adult criminal history related to DUI, larceny, and obtaining property under false pretense. Information provided to the EPD&VCTF by CI-43 was determined to be gleaned from first-hand interaction with HESS, a target subject of this investigation. Within the context of the information provided by CI-43 which was detailed and relied upon for purposes of this application, law enforcement believes the confidential source is credible and his/her information is reliable.

## FACTS ESTABLISHING PROBABLE CAUSE

20. In this affidavit, I seek permission to initiate the interception of wire and electronic communications over the TARGET TELEPHONE in order to further uncover the scope of the DTO's drug trafficking activities. In particular, the interception of the TARGET TELEPHONE will enable investigators to establish identifying information for the source of drug supply for the TARGET SUBJECTS, the location of "stash houses" being utilized by the TARGET SUBJECTS, the methods being utilized by the TARGET SUBJECTS to conceal drug proceeds, and to disrupt and dismantle this violent, drug trafficking organization.

21. During the course of the investigation, the EPD&VCTF has identified TARGET SUBJECTS RICHARDSON, BRAHEEM, THEODORE, ALVIN, JENKINS, HESS, and VINCENT to be conspiring with each other as well as with other

19

Case 3:19-mc-00033-GMG *SEALED*   Document 1-2   Filed 08/27/19   Page 20 of 66   PageID #: 40

TARGET SUBJECTS to engage in drug trafficking and violent acts in and around the Eastern Panhandle of West Virginia.

22.   In January 2019, the EPD&VCTF obtained information from CI-19 that ALVIN a/k/a "Skeeno Groove" was distributing heroin around Martinsburg, WV. CI-19 was aware that ALVIN was not local to the Martinsburg, WV area and would likely have a source of drug supply located outside of West Virginia. In an effort to identify ALVIN's source of heroin supply and disrupt their ability to traffic narcotics to the Eastern Panhandle of West Virginia, the EPD&VCTF attempted to make controlled purchases of heroin from ALVIN.

23.   On January 31, 2019, the EPD&VCTF utilized CI-19 to successfully make a law enforcement-controlled purchase of $80 worth of heroin from ALVIN.  The controlled drug buy initiated with a consensually recorded and monitored text message conversation being initiated by CI-19 with ALVIN and arranging to purchase heroin. CI-19 met with ALVIN and an unidentified black male (front seat passenger) in a vehicle being operated by ALVIN. During the meeting, CI-19 inquired if he/she would be able to purchase crack cocaine from ALVIN at a later time.  ALVIN was observed to communicate with the unidentified black male passenger before confirming that he was able to sell crack cocaine at a later meeting.  ALVIN provided CI-19 with purported heroin in exchange for $80 in recorded U.S. Currency. The purported heroin was ultimately taken into the custody of the EPD&VCTF and sent to the DEA Laboratory for analysis. The analysis confirmed the substance purchased from ALVIN was in fact approximately 0.375 grams of Fentanyl. Subsequent to the controlled drug buy, the EPD&VCTF attempted to conduct physical surveillance of ALVIN in an effort to identify his source of supply, "stash house" locations, and suspected methods being utilized to conceal the drug proceeds.  Officers attempted to follow ALVIN as he drove away from the buy meeting location. Due to counter surveillance techniques used by ALVIN,  including abrupt lane changes and

20

unnecessary turns, the officers terminated surveillance to avoid jeopardizing the investigation.

24.   On January 31, 2019, the EPD&VCTF utilized CI-19 to successfully make a second controlled purchase of $100 worth of heroin and crack cocaine from ALVIN.   The controlled buy initiated with a consensually recorded and monitored text message and voice conversation by CI-19 with ALVIN.   CI-19 arranged to purchase heroin and crack cocaine.   ALVIN directed CI-19 to meet him in an apartment building located on King Street, Martinsburg, WV.   CI-19 was directed to meet ALVIN in the hallway of the second floor of the apartment building.   Once at the captioned hallway, ALVIN provided CI-19 with purported heroin and crack cocaine in exchange for $100 in recorded U.S. Currency.   The purchased narcotics were ultimately taken into the custody of the EPD&VCTF and sent to the DEA Laboratory for analysis.   The analysis confirmed the substances purchased from ALVIN were in fact approximately 0.1385 grams of Fentanyl and 0.3682 grams of crack cocaine.   Subsequent to the controlled drug buy, the EPD&VCTF attempted to conduct physical surveillance of the apartment building utilized by ALVIN to facilitate the drug transaction. Surveillance was conducted in an effort to identify his source of supply, "stash house" locations, and suspected methods being utilized to conceal the drug proceeds.   Officers were not able to determine if ALVIN was using an apartment within the building due to the fact that he met with CI-19 in the open hallway area of the second floor.   Additionally, officers were not able to identify any apartments within the building that were associated with ALVIN or known associates of ALVIN.

25.   On February 3, 2019, the Martinsburg Police Department responded to a shooting incident which had occurred in a residence located near Raleigh Street in Martinsburg, WV. At the scene of the incident, officers observed a white male victim who had been shot in the chest.   The victim was taken to the hospital

where he was ultimately pronounced dead.  Investigating officers located a cell phone at the scene of the shooting which was determined to belong to ALVIN. The phone was assigned to telephone number 681-247-9111 (CP6).  Subsequent investigation yielded additional circumstantial evidence indicating that ALVIN had conducted a drug transaction earlier in the day in which the drugs he was trying to sell were taken from him by an unknown individual who fled from ALVIN.  ALVIN allegedly followed the individual back to the aforementioned Raleigh Street, Martinsburg, WV residence and confronted the white male victim at the doorway of the residence.  In an effort to detain ALVIN and question him regarding the murder, the EPD&VCTF sought and obtained an arrest warrant based on the two aforementioned controlled narcotics purchases made from ALVIN

26. On February 5, 2019, EPD&VCTF physically obtained CP6 as evidence transferred by the Martinsburg Police Department, for further examination by the EPD&VCTF.  Pursuant to a court authorized search warrant issued by the Berkeley County Magistrate Court, the EPD&VCTF conducted a digital forensic download of the CP6 device.  An analysis of the contents of CP6 revealed text message communications between CP6 and **TT2**.  Specifically, CP6 (belonging to ALVIN) contained the telephone number "304-579-0270" (TT2) in a list of phone contacts under the name "Wave." A sample of the text message conversations between CP6 and **TT2** were recovered from the aforementioned digital forensic download are provided as follows (*investigator notes are provided in italics*):

<div style="margin-left:2em">

(01/11/2019 beginning at 1335 hrs)

| | |
|---|---|
| CP6 text to **TT2**: | Yo I got 3 for some down (*referring to heroin*) |
| CP6 text to **TT2**: | Yo hit me I need down |
| CP6 text to **TT2**: | U ready |
| CP6 text to **TT2**: | I'm here |

</div>

| | |
|---|---|
| TT2 text to CP6: | Bet 6 min  *(TT2 is confirming that he will meet with CP6 to provide heroin)* |

**(01/23/2019 beginning at 1339 hrs)**

| | |
|---|---|
| TT2 text to CP6: | Tht thing rusty as shitlol I got U tho bro 6grams*(TT2 is referring to photographs sent earlier in the day via MMS message from CP6 to TT2 depicting a vehicle that appeared to be for sale.  TT2 is advising that he will provide 6 grams of heroin)* |
| TT2 text to CP6: | Of the good |
| CP6 text to TT2: | Yup yup |
| TT2 text to CP6: | Lmk cuz |
| CP6 text to TT2: | And all I have to do is tell E to fix it and u got him *(referring to having someone "E" fix the vehicle that is for sale)* |
| TT2 text to CP6: | And just give him some down *(referring to paying "E" with heroin to fix the car)* |

**(01/31/2019 beginning at 2303 hrs)**

| | |
|---|---|
| TT2 text to CP6: | I got the hard on deck *(TT2 is advising that he has crack cocaine available)* |
| CP6 text to TT2: | I need some right now *(CP6 is requesting crack cocaine from TT2)* |
| TT2 text to CP6: | Cops out *(TT2 is advising that there are police in the area and that CP6 will have to come to him to obtain the crack cocaine)* |

Case 3:19-mc-00033-GMG *SEALED*   Document 1-2   Filed 08/27/19   Page 24 of 66   PageID #: 44

| TT2 text to CP6: | But I'm here |
|---|---|
| TT2 text to CP6: | Bring a blunt *(TT2 is requesting that CP6 bring marijuana with him when he comes to pick up the crack cocaine)* |
| CP6 text to **TT2**: | Ok |

27. On February 7, 2019, EPD&VCTF officers located and arrested ALVIN after observing him to be a rear seat passenger in the vehicle which had previously been observed during the first of two controlled drug buys conducted on January 31, 2019. The vehicle was observed parking next to a residence in Glengary, WV. VINCENT was occupying the captioned vehicle as a front seat passenger. A search of the vehicle incident to ALVIN's arrest yielded three (3) bags of suspected crack cocaine and one (1) bag of suspected heroin. EPD&VCTF officers sought and obtained a search warrant for the captioned Glengary, WV residence where ALVIN advised that he was staying. A search of the residence yielded clothing items consistent with clothing observed during the January 31, 2019 controlled drug purchases, a handgun magazine containing eight rounds of .40 caliber ammunition, digital scales, marijuana, and thirty-three shotgun rounds. VINCENT was interviewed during the execution of the search warrant and advised the narcotics that were in the possession of ALVIN in the vehicle during his arrest, were supplied to him by "Wave" (RICHARDSON). VINCENT also provided deceptive information to investigators regarding ALVIN's role in the drug-related homicide and her own role as part of the DTO that ALVIN was involved with. ALVIN was taken to the Martinsburg Police station for further questioning where he provided investigators with a verbal confession to the murder which had occurred on February 3, 2019.

28. On April 25, 2019, investigators utilized CI-FORTY to engage in a consensually monitored conversation with RICHARDSON inside of the Fashion Factory Store. During the conversation, RICHARDSON advised that he had "down"

Case 3:19-mc-00033-GMG *SEALED*  Document 1-2   Filed 08/27/19   Page 25 of 66  PageID #: 45

*(heroin)* and could sell to CI-FORTY.   RICHARDSON further discussed drug prices and quantities.  Specifically, RICHARDSON advised that he sells heroin for $90 per gram for quantities less than 10 grams and $70 per gram for quantities of 10 grams or greater. RICHARDSON then provided CI-FORTY with a contact telephone number of "304-579-0270" (**TT2**).

29.   On April 26, 2019, the EPD&VCTF utilized CI-FORTY to successfully make a controlled purchase of $450 worth of purported heroin from RICHARDSON. The controlled drug buy initiated with consensually recorded and monitored voice calls by CI-FORTY with RICHARDSON who was utilizing **TT2**. RICHARDSON's use of **TT2** to place the call was verified by observing the caller identification listing that appeared on CI-FORTY's cell phone during the call and by a review of CI-FORTY's call log after the call.  During one of the calls, CI-FORTY states "Alright well shit, just link me and shit whenever you ready where you need me come and I'll come holler at you and shit."  RICHARDSON responded to CI-FORTY by asking, "Alright bet, what you need me to um, put together and shit?"  CI-FORTY had difficulty understanding RICHARDSON's question and asked for the question to be repeated.  RICHARDSON asked again, "What you wanted me to put together and shit?"  CI-FORTY advises to RICHARDSON, "Oh shit, just give me like five bro, I'll see what I'm hitting on and shit and go from there. I ain't trying to do too much."  RICHARDSON replies, "I got you."

30.   Based on my training, experience, and knowledge of this investigation and conferring with CI-FORTY, I believe that during this call RICHARDSON is taking an order for an amount of drugs that CI-FORTY wants to purchase.  CI-FORTY responds that he wants to purchase five grams of heroin. RICHARDSON is confirming that he can fulfill the order and sell the five grams of heroin.  Subsequent to the controlled drug buy, the EPD&VCTF attempted to conduct physical surveillance of RICHARDSON at his residence in an effort

25

to identify his source of supply, "stash house" locations, and suspected methods being utilized to conceal the drug proceeds. RICHARDSON's residence is located in a remote area of Harpers Ferry, WV, and physical surveillance is difficult. Specifically, physical surveillance officers are only able to obtain a vantage point yielding a view of the driveway of the residence. In an effort to avoid compromising the investigation, officers terminated surveillance after it was apparent that no additional vehicles could be observed in RICHARDSON's driveway. A review of covert audio and video recordings made by CI-FORTY during the controlled buy, as well as physical surveillance and monitoring by EPD&VCTF officers of real time transmitted audio during the controlled buy confirmed that RICHARDSON provided CI-FORTY with purported heroin in exchange for $450 in United States currency.

31. On April 26, 2019, the EPD&VCTF sought and obtained a Pen Register and Trap and Trace Order in the Northern District of West Virginia (3:19MC13) for 304-579-0270 (**TT2**).

32. On May 1, 2019, CI-FORTY received an incoming call from **TT1** in the presence of EPD&VCTF officers. The call was answered via speaker phone to allow for officers to monitor the call. Additionally, a recording device was used to capture the context of the call from RICHARDSON via **TT1**. RICHARDSON's use of **TT1** to place the call was verified by observing the caller identification listing that appeared on CI-FORTY's cell phone during the call and by a review of CI-FORTY's call log after the call. During the call, RICHARDSON asked "What you trying to get?" to which CI-FORTY replied, "The same thing, what I was talking about in the store." CI-FORTY was referring to an earlier, face to face, meeting between CI-FORTY and RICHARDSON in which $550 worth of heroin and 7 grams of crack cocaine were agreed upon as a purchase amount. RICHARDSON responded on the telephone call, "Alright, alright, so um, is that

26

Case 3:19-mc-00033-GMG *SEALED*  Document 1-2  Filed 08/27/19  Page 27 of 66  PageID #: 47

the full ball or the um." CI-FORTY confirms that he/she wants to purchase the amount of narcotics noted above.

33.     Based on my training, experience, and knowledge of this investigation and conferring with CI-FORTY, I believe that during this call RICHARDSON is taking an order for an amount of drugs that CI-FORTY desires to purchase. CI-FORTY reminds RICHARDSON of the amount that was previously discussed in a face to face meeting of $550 worth of heroin and 7 grams of crack cocaine. RICHARDSON then refers to the "whole ball" indicating that he can sell 1/8th of an ounce of crack cocaine to CI-FORTY and "the last one" referring to his remaining amount of heroin available for sale. Subsequent to the controlled drug buy, the EPD&VCTF attempted to conduct physical surveillance of RICHARDSON at his residence in an effort to identify his source of supply, "stash house" locations, and suspected methods being utilized to conceal the drug proceeds.  RICHARDSON's residence is located in a remote area of Harpers Ferry, WV, and physical surveillance is difficult.  Specifically, physical surveillance officers are only able to obtain a vantage point yielding a view of the driveway of the residence.   In an effort to avoid compromising the investigation, officers terminated surveillance after it was apparent that no additional vehicles could be observed in RICHARDSON's driveway.  A review of covert audio and video recordings made by CI-FORTY during the controlled buy, as well as physical surveillance and monitoring by EPD&VCTF officers of real time transmitted audio during the controlled buy confirm that RICHARDSON provided CI-FORTY with purported heroin and crack cocaine in exchange for $750 in United States currency.

34.     On the evening of May 3, 2019, CI-FORTY attempted to make a controlled purchase of five (5) grams of heroin from RICHARDSON.  CI-FORTY was advised by RICHARDSON that he would contact CI-FORTY after he closed the shop "Fashion Factory." Ultimately, the drug transaction was rescheduled at